UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ARTHUR JENNEJAHN,

                Plaintiff,

       v.

VILLAGE OF AVON, et al.,

                Defendants.
_____

DECISION & ORDER

06-CV-6054T

**PRELIMINARY STATEMENT**

Plaintiff Arthur Jennejahn ("Jennejahn") has initiated the above-captioned action under 42 U.S.C. § 1983 against the Village of Avon, the Village of Avon Police Department, Avon Chief of Police James Carney and Avon Police Officer Brian Sexstone ("Sexstone"). (Docket # 1). Pursuant to 28 U.S.C. § 636(c), the parties have consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment. (Docket # 9). Currently before this Court is defendants' motion for summary judgment. (Docket # 21). For the reasons discussed below, defendants' motion is granted.

**FACTUAL BACKGROUND**

The following facts are derived from the parties' statements of material facts submitted pursuant to Rule 56.1 of the Local Rules of Civil Procedure for the Western District of New York. (Docket ## 21, 24, 25, 26). They are undisputed except where otherwise noted.

For over thirty-five years, Arthur Jennejahn and his wife have resided on South

Avenue in Avon, New York. In the early 1990s, Jay and Joyce Brown moved into the house across the street from the Jennejahn residence. Almost immediately after the Browns moved to the neighborhood, they and the Jennejahns developed a discordant relationship, resulting in numerous calls by both sides to the Village of Avon Police Department (the "Police Department").

Particularly relevant to this litigation is a dispute that occurred on the afternoon of June 14, 2004, when Jennejahn and his wife were at home planting flowers. While they were planting in the front yard, the Browns' dog began to bark. Jennejahn remarked to his wife, "I guess we have to listen to the dog while we are out here." Apparently overhearing the comment, Joyce Brown appeared from around the corner of a fence on her property, waved her finger and stated, "[M]y dog can bark if it wants to." Jennejahn responded, "[N]ot like that," and Joyce Brown replied, "[W]e'll see about that" and took the dog into her house.

After Jennejahn and his wife had finished gardening, they left their home to dine at a restaurant. While they were out, Jay Brown called the Police Department to report his wife's encounter with Jennejahn. Officer Sexstone responded to the call by driving to the Browns' residence and speaking to Jay Brown in person. Prior to this encounter, Sexstone had not had any contact with either the Browns or the Jennejahns and had not been aware of their ongoing disputes.[1] Brown reported to Sexstone the ongoing problems that existed between Jennejahn and himself, specifically complaining that Jennejahn honked his car horn at all hours of the night, yelled obscenities and harassed guests who entered and exited the Browns' residence. Sexstone

---

[1] James Carney, Chief of the Police Department, testified that the department had received numerous complaints over many years from the Browns and the Jennejahns about the others and he assumed that officers in the department would have known about their disputes. (Docket # 24-4 at 50).

prepared an incident report documenting these reported interactions. Jay Brown also swore out a complaint against Jennejahn accusing him of harassment in the second degree, a violation under Section 240.26(3) of the New York Penal Law.[2]

Later that evening, at approximately 8:00 p.m., Sexstone came to Jennejahn's residence, knocked on the door and asked whether he could come inside to talk "about the Browns." Jennejahn responded, "[I]f you are with the Village of Avon Police, I will not talk to you without counsel." Jennejahn inquired "[A]m I under arrest?" and Sexstone replied, "[Y]es, I got to do what I got to do."

According to Jennejahn, Sexstone violently grabbed his arm, spun him around, released his arm and forcefully grabbed his shoulders. Sexstone then allegedly pushed Jennejahn into the stove and pat frisked him. Following the frisk, Sexstone placed Jennejahn in handcuffs, ignoring Jennejahn's complaint that they were too tight, and escorted him to the patrol car that was parked in front of the Browns' residence. Jennejahn asserts that he was cooperative and told Sexstone that he would leave willingly and did not need to be handcuffed.

Defendants dispute Jennejahn's account of his arrest. According to Sexstone, he attempted to discuss the matter with Jennejahn, but Jennejahn refused to speak to him. Sexstone affirms that he used no force to arrest Jennejahn and did not apply the handcuffs until he was

---

[2] Section 240.26(3) of the New York Penal Law provides:

> A person is guilty of a violation of harassment in the second degree when, with intent to harass, annoy or alarm another person . . . [h]e or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.

N.Y. Penal Law § 240.26(3). Violations are punishable by a maximum term of imprisonment of up to fifteen days and a fine of up to $250. *See* N.Y. Penal Law §§ 70.15(4), 80.05(4).

prepared to place Jennejahn in his patrol car. Sexstone further maintains that because Brown had requested that an order of protection be issued against Jennejahn, he was required to take Jennejahn before a judge.

Following his arrest, Sexstone transported Jennejahn to court, where he was arraigned before a judge on the violation charge. The judge issued an order of protection requiring Jennejahn to stay away from the Browns, and the case was adjourned in contemplation of dismissal. The charge against Jennejahn was dismissed six months later.

Jennejahn asserts three claims under Section 1983 arising from the above-described events: (1) a claim against all defendants that Sexstone used excessive force in effecting Jennejahn's arrest; (2) a claim against all defendants that Sexstone used excessive force in accordance with the policies and practices of the Village of Avon; and (3) a claim against all defendants that they selectively enforced the law against Jennejahn in violation of the Equal Protection Clause.[3]  (Docket # 1). Defendants move for summary judgment on each of the claims. (Docket # 21). Jennejahn opposes the motion, arguing that genuine disputes of material fact remain as to each claim. (Docket # 24).

## DISCUSSION

**A. Standard for Summary Judgment:** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

[3] Jennejahn's Complaint also included a substantive due process claim. (Docket # 1). Jennejahn now concedes that that claim fails as a matter of law. (*See* Docket # 24-9 at 5). I concur and accordingly grant summary judgment to defendants on Count Three, the substantive due process claim.

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In reaching this determination, the court must assess whether there exist any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the nonmoving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts.  *Bryant v. Maffucci*, 923 F.2d at 982 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution . . . . It must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv. Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**B. Jennejahn's Claims of Excessive Force:** Jennejahn's first and second claims assert, respectively, that he was subjected to excessive force at the time of his arrest by Officer Sexstone and that such force was authorized by the policies and practices of the Village of Avon Police Department. Defendants argue that Jennejahn's claims of excessive force fail because he cannot demonstrate that he suffered any injury.

To establish a claim under Section 1983, a plaintiff must demonstrate that the challenged conduct (1) was "committed by a person acting under color of state law;" and (2) "deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). By itself, Section 1983 creates no substantive rights; instead, it provides a "procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Here, no genuine dispute exists that defendants were acting under color of state law. Rather, the central inquiry is whether Sexstone's actions violated Jennejahn's constitutional rights.

Claims arising from the use of force during an arrest are judged by the "objective reasonableness" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 397

(1989). Determination of whether the amount of force used to seize someone was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests as stake." *Graham v. Connor*, 490 U.S. at 396 (internal quotations omitted).

Courts have long recognized that a police officer's right to make an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotations omitted). A police officer's application of force is excessive if it is objectively unreasonable "in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation." *Id.* at 397.

Jennejahn concedes that probable cause existed for his arrest, and thus implicitly concedes that Sexstone was authorized to use some degree of force or the threat thereof to effect that arrest. He simply maintains that the amount of force Sexstone used was excessive. *Id.* at 396. For a claim of excessive force to be actionable, a plaintiff must demonstrate that it was "objectively sufficiently serious or harmful." *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999). Stated another way, "the force used by the defendant [generally] must be more than *de minimis* in order for the plaintiff's claim to be actionable." *Bell v. Chemung County*, 2006 WL 839413, *3 (W.D.N.Y. 2006) (citing *Graham*, 490 U.S. at 397; *Romano v. Howarth*, 998 F.2d

101, 105 (2d Cir. 1993) (a *de minimus* use of force will rarely suffice to state a constitutional claim)). As the Supreme Court has acknowledged, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396.

In his affidavit submitted in opposition to the instant motion, Jennejahn described his arrest as follows:

> Officer Sex[s]tone then violently grabbed my arm, pulling me towards him, spinning me around, then letting go of my arm and aggressively grabbed my shoulders. Officer Sex[s]tone pushed me into the stove and began to pat me down.
>
> After Officer Sex[s]tone patted me down, he violently grabbed my shoulders, slapping with force down on my shoulders, clamped my shoulders and twisted me around.
>
> I was then pushed into the stove, my arms were forcefully placed behind my back, and I was handcuffed. My arms were put behind my back, without Officer Se[x]stone ever asking me, even though I was cooperative, to put my hands behind my back. The handcuffs were placed on me very tight, to which I complained, however, Officer Sex[s]tone ignored my complaints.
>
> I indicated to Officer Se[x]stone that I did not need to be handcuffed, that I would willingly walk out to the car and that I would not give Officer Se[x]stone any trouble, however, Officer Se[x]stone proceeded to handcuff me, without informing me that he was required to do so.

(Docket # 24-7 at ¶¶ 108-111).

At his deposition, Jennejahn testified as follows concerning his arrest:

> Q: When Officer Sex[s]tone grabbed your arm, is that after you became aware that you were under arrest?
> A: Yes.
> Q: Okay. Then Sex[s]tone grabbed your arm?
> A: Yes.

> Q: He began to pat you down?
> A: He patted me down and then he put his hands on my shoulders and clamped and twisted me.
> Q: Okay. When he twisted you, did you injure your knee at all, injure your leg at all?
> A: No. . . .
> Q: Did he injure your shoulders at all?
> A: No, he did not.
> Q: You have a prior problem with your left shoulder, is that right? . . . Rotator cuff issue?
> A: I have it on both of my shoulders.
> Q: Tendonitis?
> A: I have – yeah, I guess you would call that tendonitis. I have what you call a spur.
> Q: You got some spurring in your shoulders?
> A: Yeah. Calcium deposits.
> Q: Officer Sex[s]tone didn't injure or aggravate that at all when he twisted you around?
> A: No.
>
> * * *
>
> Q: [W]hat personal injury did you suffer as a result of the arrest?
> A: It would be shame, it would be mental anguish, humiliation. . . .
> Q: Any other injuries?
> A: Other than my rights, no.
>
> * * *
>
> Q: Did he grab your arm forcefully?
> A: Yes. He's a big man.
> Q: Did he grab your arm hard enough to jar you or knock you off balance at all?
> A: Yeah. When he grabbed me he pulled me towards him. He's got long arms. He's, I don't know, six two, six three. . . .
> Q: Did he forcefully slap on top of your shoulders prior to clamping them?
> A: With some force.
> Q: When he clamped your shoulders, was that with some force?

>   A: Yes.
>   Q: Did he grab your arms and put them behind your back?
>   A: Yes.
>
>   * * *
>
>   Q: Now you said he grabbed you and pulled you. Is that when you went into the stove, when he grabbed your arm?
>   A: Yes. He pulled me right into it at that point as I recall.
>   Q: Okay. That was after you became aware that you were under arrest.
>   A: Yes.
>   Q: Did he leave any marks on your arm?
>   A: No, that I can – you know, no, because – let's see. Okay, you know when you're on blood thinners? . . . If I take my knuckle and go like this, I would say, within a couple of days or a day I'll have a black mark like this. . . .
>   Q: I believe your testimony, when I asked you a question if you had any bruising on your arm, you said no, but now you think you may recall bruising?
>   A: It doesn't take much for me to bruise. . . .
>   Q: Why don't we just put it this away: do you or do you not recall having any bruising on your arm from where Officer Sex[s]tone grabbed you?
>   A: I would have to say I don't recall.
>   Q: Okay. Do you recall having any bruising on your shoulders at all?
>   A: No. . . .
>   Q: Do you recall any bruising or marks from the handcuffs?
>   A: No.

(Docket # 24-2 at 55-56, 64-65, 75-77, 80-82).

Based on the record before the Court, a genuine dispute obviously exists as to whether Sexstone used any force in effecting Jennejahn's arrest. Sexstone maintains that he did not touch Jennejahn other than to pat search him and to apply handcuffs before placing him in the patrol car. Jennejahn, by contrast, describes Sexstone's actions as marked by forceful grabbing, pulling, spinning, pushing, slapping down, clamping and twisting. While this factual dispute

cannot be resolved at this stage of the litigation, it nonetheless does not defeat defendants' position because even if Jennejahn's account of his arrest is credited, Sexstone's actions involved no more than *de minimus* use of force.

Jennejahn's complaints concern the manner in which Sexstone temporarily took control of him and restrained him in order to pat frisk him and apply handcuffs. Although Sexstone's actions may have been overly-assertive in hindsight, especially targeted towards a sixty-five year old man who was smaller than the arresting officer, Jennejahn has not presented evidence from which a trier of fact could conclude that his conduct was objectively sufficiently serious or harmful to rise to the level of a constitutional violation. Although a showing of excessive force does not require proof of permanent injury, *see Corselli v. Coughlin*, 842 F.2d 23, 26 (2d Cir. 1988) ("[e]ven if the injuries suffered 'were not permanent or severe,' a plaintiff may still recover if the 'force used was unreasonable and excessive'") (quoting *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987)), Jennejahn suffered *no* demonstrable physical injury as a result of Sexstone's actions.[4] The absence of any injury, however slight or fleeting, is particularly compelling in this case considering Jennejahn's own testimony concerning the ease with which he bruises.

Jennejahn's assertions about the arresting officer's conduct, coupled with the absence of any injuries therefrom, are similar to those which courts have repeatedly found insufficient to withstand summary judgment. *See, e.g.*, *Nolin v. Isbell*, 207 F.3d 1253, 1257-58 (11th Cir. 2000) (granting summary judgment to officer who caused temporary bruising to

---

[4] Jennejahn's Complaint does not assert that he suffered any physical injury from Sexstone's actions. (*See* Docket # 24-5).

plaintiff when he shoved plaintiff against a van, pressed his knee against plaintiff's back and pushed plaintiff's head into the side of a van during the course of arrest); *Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (affirming summary judgment dismissing plaintiff's claims of excessive force during arrest where officer pushed him against the wall of the police station and handcuffed him too tightly causing pain, but no demonstrable permanent injuries); *Vogeler v. Colbath*, 2005 WL 2482549, *10 (S.D.NY. 2005) (granting summary judgment dismissing claims of excessive force during arrest where plaintiffs' handcuffs were applied too tightly causing "minor discomfort" and where plaintiffs were lifted off the ground by their arms as they were handcuffed, but sustained no injury); *Bradley v. Village of Greenwood Lake*, 376 F. Supp. 2d 528, 535 (S.D.N.Y. 2005) (granting summary judgment dismissing excessive force claim against arresting officer who kicked plaintiff in the stomach causing temporary nausea and an abdominal scratch); *Esmont v. City of New York*, 371 F. Supp. 2d 202, 213-15 (E.D.N.Y. 2005) (granting summary judgment dismissing excessive force claim where arresting officer caused plaintiff to bump her head as she was placed in patrol car, resulting in a headache; left her in hot patrol car for ten minutes, resulting in profuse sweating; and applied handcuffs too tightly, resulting in bruising, swelling and unsubstantiated claims of nerve damage); *Roundtree v. City of New York*, 778 F. Supp. 614, 622 (E.D.N.Y. 1991) (granting motion to dismiss excessive force claims where arresting officer pushed plaintiff into a patrol car causing him emotional pain and suffering; "to conclude that a 'push' that does not cause the slightest of physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to hold that *any* physical contact by an arresting officer with the arrested person is actionable . . . and would transform the constitutional wrong of excessive force in arrest into the

common law tort of battery"). *Cf. Maxwell v. City of New York*, 380 F.3d 106, 108-10 (2d Cir. 2004) (reversing district court's grant of summary judgment to defendants on excessive force claim where police officer shoved plaintiff head first into the partition of a patrol car, resulting in pain and post-concussive syndrome).

In sum, I find that even under the most generous construction of Jennejahn's allegations, he cannot demonstrate that he was subjected to objectively unreasonable force by Officer Sexstone. Because his claim of excessive force fails, so too does his second claim alleging that the challenged force was authorized by the Town's policies and procedures. Accordingly, defendants' motion for summary judgment as to Jennejahn's excessive force claims, Counts One and Two, is granted.

**C. Jennejahn's Equal Protection Claim:** Jennejahn's equal protection claim is similarly unavailing. Although the precise contours of Jennejahn's equal protection claim are difficult to discern, it appears that the claim is premised on two contentions: first, that defendants selectively enforced the law against him by "arbitrar[ily] and capricious[ly] . . . subjecting [him] to undue excessive force as a result of an alleged misdemeanor charge"; and, second, that defendants selectively enforced the law by "fail[ing] to respond to multiple complaints made by [Jennejahn] against his neighbor, Jay Brown." (Docket # 24-5 at ¶¶ 46-50).

The Equal Protection Clause of the United States Constitution demands that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). An equal protection claim based upon selective enforcement arises if: "(1) the person, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion,

intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LaTrieste Restaurant and Cabaret Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980), *cert. denied*, 450 U.S. 959 (1981)), *cert. denied*, 528 U.S. 1187 (2000). "[T]he key issue in an equal protection claim alleging selective enforcement [is] impermissible motive." *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999).

Turning first to Jennejahn's contention that defendants violated the equal protection clause by subjecting him to excessive force when he was arrested on the harassment violation, that claim fails for several independent reasons.  First, Jennejahn's failure to demonstrate the existence of any disputed material facts concerning his excessive force claim similarly forecloses any equal protection claim based on excessive force (even assuming that such a claim could be stated).  Second, Jennejahn has cited no authority, and this Court is aware of none, supporting his unusual contention that the law was selectively enforced against him when he was *unlawfully* subjected to the use of excessive force during his arrest.  To accept his argument would broaden every excessive use of force claim into a separate equal protection claim.  Third, even if such an unorthodox claim could be found within the parameters of the Equal Protection Clause, Jennejahn has offered no evidence concerning the manner in which defendants treated other persons arrested for harassment violations.

Turning next to Jennejahn's second contention, he maintains that the law was selectively enforced against him when he was arrested on a harassment violation and his neighbors were not.  Specifically, Jennejahn testified that he wanted to swear out a complaint against the Browns on numerous other occasions, but was not permitted to do so.  Jennejahn

further alleges that his complaints about harassing and annoying conduct by the Browns towards him did not result in their arrest, although their complaints about him did.  The explanation for defendants' disparate treatment of Jennejahn and the Browns, Jennejahn asserts, is that Jay Brown's father, a retired New York State Trooper, improperly exerted "political influence" over the Avon Police Department.  (Docket # 24-7 at ¶ 73).

        As set forth above, proof of two elements is essential to a selective enforcement claim: (1) selective treatment compared to others similarly situated; and (2) impermissible motive for that treatment.  Although I have serious doubts about whether Jennejahn has raised a genuine dispute of material fact as to the first element,[5] I need not resolve those doubts because I am persuaded that he has not raised a genuine dispute of fact as to the second.  Jennejahn's contention that he was singled out for unfavorable treatment because Brown's father exercised improper political influence over the defendants is purely speculative and not grounded in any facts reasonably supporting his theory.

        Jennejahn testified during his deposition that he observed Jay Brown's father, Fred Brown, exit the building housing the Avon Police Department "many times."  (Docket # 24-2 at 29).  He also testified that some hours after a disagreement he had had with Jay Brown, Jay Brown's father followed his car into his driveway and that a short time later Chief Carney arrived.  According to Jennejahn, Fred Brown attempted to enter Jennejahn's residence with

---

[5] Specifically, it is far from clear that Jennejahn has asserted sufficient facts to demonstrate that the incidents about which he complained to the police were sufficiently similar to Brown's complaint on June 14, 2004, to warrant identical treatment.  Nor is it clear that Jennejahn has raised a genuine issue of fact concerning the veracity of Officer Sexstone's sworn deposition testimony that he — who had never before responded to a complaint by the Browns or the Jennejahns – was unaware of the history between the neighbors.

Carney, but Carney stopped him and told Brown that he would handle the matter.  These facts do not reasonably suggest that Carney was acting at the behest of Fred Brown.[6]  In sum, I find that Jennejahn's self-serving and conclusory allegations of political influence are insufficient to establish a claim for selective prosecution, or the existence of a material issue of fact concerning the same.  *See Hi Pockets, Inc. v. Music Conservatory of Westchester, Inc.*, 192 F. Supp. 2d 143, 158 (S.D.N.Y. 2002) (granting defendants' motion for summary judgment as to plaintiff's equal protection claim alleging that defendants had selectively granted building permits on the basis of political motives; plaintiff failed to demonstrate that discrimination was based on impermissible factor or that defendants intended to cause injury to plaintiff).  *See also Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d at 17 ("assertion that [defendants] enforced the [law] . . . with an impermissible motive is sheer conjecture and speculation that is insufficient to withstand [defendants'] motion for summary judgment") (internal quotations omitted).

        Defendants' motion for summary judgment as to Jennejahn's equal protection claim is therefore granted.

---

[6] Carney was not questioned at his deposition about his relationship, if any, with Fred Brown.

## **CONCLUSION**

For the foregoing reasons, defendants's motion for summary judgment (**Docket # 21**) is **GRANTED**.  The Clerk of the Court is hereby directed to enter judgment in favor of defendants and close the case.

**IT IS SO ORDERED.**

s/ Marian W. Payson
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
        August   22  , 2008